# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
### ***

| | |
|---|---|
| SCOTT GREEN,<br><br>      Petitioner,<br><br>vs.<br><br>MARGARET GREEN,<br><br>      Respondent. | Case No. 2:15–cv–1795–GMN–VCF<br><br>**REPORT & RECOMMENDATION**<br><br>MOTION FOR THE RETURN OF CHILDREN (#8)<br>PETITION FOR WARRANT (#9) |

Scott and Margaret Green attempted to save their marriage by moving from Las Vegas, Nevada to Lake Louise, Alberta. The couple obtained new jobs and settled into a newly renovated home. Their two minor children enrolled in Banff Elementary School and became proficient skiers. But, the relocation did not save the marriage.

After ten months in Canada, Mrs. Green returned to Las Vegas with the children. She commenced a divorce proceeding in Nevada and Mr. Green commenced a divorce proceeding in Alberta. Mr. Green now petitions this court under The Hague Convention on the Civil Aspects of International Child Abduction for the return of his children. He contends that Canada is the appropriate forum for custody proceedings because Canada became the children's "habitual residence."

The court disagrees. Although Mr. and Mrs. Green mutually intended to make Lake Louise the children's home, Mr. Green failed to provide "unequivocal" evidence that the children's relative attachments to Lake Louise "supplanted" their relative attachments to Las Vegas. Therefore, the court recommends denying Mr. Green's Motion for the Return of Children (#8) and his Petition for Warrant (#9).

1

# I. Background

Mr. and Mrs. Green were married in Las Vegas, Nevada on November 7, 2005. They moved into Mrs. Green's home on Cherwell Court and Mrs. Green became pregnant with the couple's first child. Mr. Green was unemployed and Mrs. Green supported the couple by operating an online business.

In February of 2006, Mr. Green began working in a café at the Mandalay Bay Hotel & Casino. The couple's child was born soon afterwards. Mrs. Green stayed home with the baby while Mr. Green focused on his career in the food-and-beverage industry.

After working at Mandalay Bay for seven months, Mr. Green obtained a new position at the Little Buddha restaurant in the Palms Resort Casino. In June 2007, Mr. Green obtained another position as a consultant for Celebrity Cruise Lines. This position required him to relocate to Florida and travel to Holland and Germany, where the company builds new ships.

Mrs. Green and the child stayed in Las Vegas. The distance placed a significant strain on the couple's relationship. Mr. Green testified that he visited Las Vegas frequently. Mrs. Green testified that he visited infrequently. She also testified that when he visited he drank heavily.

In 2009, while the couple was considering divorcing, Mrs. Green became pregnant with their second child. The pregnancy terminated divorce discussions and prompted Mr. Green to move home. He obtained a position with the room service department at Caesars Palace Las Vegas Hotel and Casino. The second child was born on February 17, 2010.

In September of 2012, Mr. Green moved out of the Cherwell Court residence and the couple separated.

In November of 2013, the Greens began dating again. They were still legally married and both saw other people. In early 2014, Mrs. Green had a boyfriend staying with her at the Cherwell Court home. Mr. Green was offered a position as the Executive Chef at the Lake Louise Ski Resort in Banff National Park

in Alberta, Canada.

He told Mrs. Green about the job. He wanted it, but did not want to live so far away from the children. He also said the position paid less than his current position; but the job in Lake Louise would permit him to spend more time with the family. Mrs. Green left her boyfriend; and the couple decided to give their marriage a second chance.

Mr. and Mrs. Green flew to Alberta and met with Mr. Green's prospective supervisor, Dave Schebek, who testified that he wanted the Greens to experience what "life in Lake Louise is all about." Mr. Schebek showed the couple a home that would be renovated for the family and Mrs. Green appears to have participated in negotiating Mr. Green's compensation package with Mr. Schebek.

The Greens weighed the pros and cons of living in a national park, which included free ski passes for the children and a forty minute bus ride to school. They also discussed the possibility of eventually buying a home outside of the park, but this appeared to have been cost prohibitive.

Mr. Green, Mrs. Green, and Mr. Schebek also discussed the expected length of the family's stay in Lake Louise. Mr. Green and Mr. Schebek testified that Mr. Green would be expected to remain with the company for at least three-to-five years. Mrs. Green testified that the offer of employment was expressly limited to two years.

When the couple returned to Las Vegas, they began deliberating. Mrs. Green spoke with her ex-boyfriend, Rakan Hamawi, and her two teenage children from a previous relationship with Mr. Hamawi. She gave the children the choice of remaining in Las Vegas or moving to Lake Louise. One child decided to move to Lake Louise and the other decided to stay in Las Vegas.

Mr. and Mrs. Green met with Mr. Hamawi on his front patio and discussed the move. Mr. Hamawi initially protested, stating that Mr. Green was "taking [his] child away" from him. He eventually acquiesced and signed a consent form permitting his child to move to Alberta.

3

Mr. Green subsequently accepted the job offer and the couple decided to move to Canada. Around this time, the couple considered renting or selling the Cherwell Court residence. However, no action was taken. The Greens lacked the funds to renovate and lease the home. Mrs. Green also had a pending bankruptcy petition, which prevented her from selling the home.

In May of 2014, Mr. Green began working for Lake Louise Ski Resort as a consultant. Recent changes to Canada's immigration policy complicated his transition into the country. As a result, the company hired him as a temporary employee, even though he and Mr. Schebek expected Mr. Green to work in Lake Louise for three-to-five years. Meanwhile, the Greens held three garage sales in Las Vegas and prepared to downsize before the move.

In August of 2014, the family obtained VISAs and immigrated to Canada. They packed the majority of their possessions in Las Vegas, leaving behind appliances and a limited amount of furniture. Even though Mr. Green had purchased new beds for the children in Canada, Mrs. Green packed the children's beds in Las Vegas, which were put in storage in Canada. Atlas Van Lines, Inc. insured the value the goods it moved for the Greens for $93,000.00. Mr. Green's new employer paid the moving costs.

From August 26, 2014, through June 28, 2015, the family lived in Lake Louise, Alberta. Mr. Green's company renovated a home for the family. Each of the three children had their own bedroom, which they filled with toys and personal effects from Las Vegas. The children enrolled in Banff Elementary School and became proficient skiers. Mrs. Green obtained as job as a sales clerk and Mr. Green continued to work as the Executive Chef. At one point, Mrs. Green returned to Las Vegas to finalize her bankruptcy. The children remained in Lake Louise with Mr. Green, who cooked meals, took them to school, and provided general parental care.

In April of 2015, after Mrs. Green's bankruptcy was finalized, Mr. Green contacted Ben Hadj, a personal friend and realtor in Las Vegas. Mr. Hadj gave Mr. Green listings of comparable properties that

4

could be used to sell the Cherwell Court residence. Meanwhile, Mr. and Mrs. Green signed various documents to extend their VISAs and remain in Canada. Mr. Green also executed various contracts to keep his position as the Executive Chef and maintain his immigration status as the resort's employee.

The Greens' marriage remained unstable. Mr. Green appears to have spent most nights sleeping on the living room couch while Mrs. Green slept in the master bedroom. After the children's school year ended in June, Mrs. Green decided to leave. On June 28, 2015, the couple packed Mrs. Green's car and a U-Haul trailer and Mrs. Green left for Las Vegas with the couple's children.

As Mrs. Green approached the border, Mr. Green sent various messages to clarify the nature of the children's departure. Because the family had moved to Lake Louise, he wanted assurances that the children were not relocating to Las Vegas and were merely going on a summer vacation. Mrs. Green never responded. The majority of the children's belongs remained in Lake Louise. =

Divorce proceedings in both jurisdictions followed. On September 18, 2015, Mr. Green petitioned this court to return his children to Alberta under The Hague Convention on the Civil Aspects of International Child Abduction. The court held an evidentiary hearing on October 28, 2015. This report and recommendation follows.

## II. Legal Framework

"The Hague Convention on the Civil Aspects of International Child Abduction generally requires courts in the United States to order children returned to their countries of habitual residence, if the courts find that the children have been wrongfully removed to or retained in the United States." *Chafin v. Chafin*, 133 S. Ct. 1017, 1021 (2013).[1] The Convention's aim is twofold: (1) it protects children from the harmful effects of being removed from the family and social environment in which their lives have developed and

---

[1] The Convention has been implemented by Congress through the International Child Abduction Remedies Act, ("ICARA"), 22 U.S.C. §§ 9001, *et seq*. It Act was previously codified at 42 U.S.C. §§ 11601, *et seq*.

(2) it deters parents from unilaterally removing or retaining children by preventing the abducting parent from obtaining custody in the country to which the child was taken. *Mozes v. Mozes*, 239 F. 3d 1067, 1070 (9th Cir. 2001) (citation omitted).

The Convention's key operative concept is "wrongful" removal or retention. *Id*. The removal or retention of a child is "wrongful" where:

> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the Child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Id*. at 1070 (citing Hague Convention, art. 3, 19 I.L.M. at 1501).

In *Mozes v. Mozes*, the Ninth Circuit determined that these provisions require a court to ask four questions: (1) when did the removal or retention at issue take place? (2) immediately prior to the removal or retention, in which state was the child habitually resident? (3) did the removal or retention breach the rights of custody attributed to the petitioner under the law of habitual residence? (4) was the petitioner exercising those rights at the time of the removal or retention? 239 F. 3d at 1070.

In this case, the answer to the first question is clear. Mrs. Green removed the children from Canada on June 28, 2015, when she left her husband and returned to Las Vegas. The gravamen of the Greens' dispute concerns the second question: whether Mr. Green satisfied his burden of showing that the "habitual residence" is Lake Louise rather than Las Vegas.[2] The court's analysis begins with the governing law.

---

[2] Because the heart of the Greens' dispute concerns the second question and, as discussed below, before the court finds that Mrs. Green's retention of the children was not "wrongful," the court abstains from addressing the remaining two *Mozes* questions.

6

### III. Habitual Residence

The term "habitual residence" is central to the Hague Convention. *Guzzo v. Cristofano*, 719 F.3d 100, 106 (2d Cir. 2013) (citing *Mozes*, 239 F. 3d at 1072). It was deliberately left undefined, *see Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004), because it is not a legal concept. *Guzzo*, 719 F.3d 106 (citation omitted). It is a "nontechnical" term—a question of "pure fact" designed to be interpreted according to the "ordinary and natural meaning of the two words" with reference to "all the circumstances" of a particular case. *Id.* (citing *Koch v. Koch*, 450 F.3d 703, 712 (7th Cir. 2006)); *Mozes*, 239 F.3d at 1071. As described by the Ninth Circuit, habitual residence is tantamount to a child's home. *Holder*, 392 F.3d at 1019.

The court's duty to determine a child's habitual residence does not grant it license to adjudicate the merits of the parents' custody dispute. *See* 42 U.S.C. § 11601(b)(4); *Papakosmas v. Papakosmas*, 483 F.3d 617, 621 (9th Cir. 2007). The question is not who is the better parent, which country is a better place to raise the child, or what is the best interest of the child. *Friedrich v. Friedrich*, 78 F.3d 1060, 1068 (6th Cir. 1996)). The court's only concern is determining the country that is the center of the child's life—the "locus of its family and social development." *See id*; *Mozes*, 239 F.3d at 1084. Once established, the court "shall act expeditiously" to return the child to that country for custody proceedings under its domestic law. *Papakosmas*, 483 F.3d at 621 (citing *Holder*, 392 F.3d 1013).

The nontechnical nature of the court's inquiry does not make the decision easy. It is difficult to determine what circumstances make a new country one's home. A new country does not become home simply because a family begins life on foreign soil. *See Holder*, 392 F.3d at 1019. One spouse may enthusiastically declare the new country home while the other begrudgingly accepts changed circumstances. *See Mozes*, 239 F.3d at 1077. These diverging attitudes may confuse and color how a child regards the country it left and the country it arrived to. *Id.* at 1080. Alternatively, a family may live abroad

for a long duration but center their lives elsewhere. *Id*. at 1073. Or, the decision to make a foreign county home may coalesce during the course of a stay that was originally intended to be temporary. *Id*. at 1075.

Home is more than mere physical presence in a new location; but it is also more than "acculturation" to a new community. *See id*. at 1082. A child who spends months at summer camp or even a year studying abroad has become acculturated, but is not at home. *Id*. at 1074, 1083. A child's life in a foreign country may become firmly embedded in a short period of time, but if the parents intend to leave courts hesitate to find that the child is at home. *See id*. at 1076. Similarly, a child and its family may become habitually resident in a new country, but if the family's prior habitual residence is not "supplanted" by the new habitual residence, courts will not conclude that the child is at home in the new country. *Id*. at 1082.

These observations show that the circumstances that make a new place home are not easily created or defined. "Home," said Robert Frost, "is the place where, when you go there, they have to take you in." Robert Frost, The Death of the Hired Man, *in* THE POETRY OF ROBERT FROST 38 (Edward C. Latham ed., 1967) (quoted by *United States v. Craighead*, 539 F.3d 1073, 1082-83 (9th Cir. 2008)). Echoing Frost, the U.S. Courts of Appeals have adopted a two-part test, which first looks to the intentions of a child's parents or caregivers—those who have to take the child in. *Mozes*, 239 F.3d at 1078, 1081.

Because children "normally lack the material and psychological wherewithal to decide where they will reside," *id.* at 1076, courts rely on the parent's intentions as a proxy for locating a child's home. Under this prong, in order to acquire a new habitual residence, the parents must manifest a "settled intention to abandon the one left behind." *Id*. at 1075. When making this inquiry, the court looks to the "agreement between the parents and circumstances surrounding" their decision to relocate their family." *Id*. at 1081.

However, parental intent is not dispositive. A child may "lose its habitual attachment to [its previous home] without a parent's consent." *See Papakosmas*, 483 F.3d at 622 (citing *Mozes*, 239 F.3d at

8

1081). Alternatively, a child may "become so firmly embedded in [a] new country as to make it habitually resident even though there be lingering parental intentions to the contrary." *Mozes*, 239 F.3d at 1078 (citation omitted).

Consequently, the second prong requires an "actual change in geography" and an "appreciable" passage of time that is sufficient for the child to "acclimate" or "acclimatize" to the new country. *Id.* at 1078; *Guzzo*, 719 F.3d at 103 n. 2. Acclimation and acclimatization are "not be confused with acculturation." *Holder*, 392 F.3d at 1019. The question is not whether a child speaks a foreign language or prefers the new culture, *see id.*, but whether he or she has "sufficiently settled into . . . the new environment" so that the court may conclude that the child is at home. *See Guzzo*, 719 F.3d at 111.

Satisfying the second prong is difficult. The court's inquiry is made among parents with competing claims to loved ones, who "lack the material and psychological wherewithal to decide" for themselves. *Mozes*, 239 F.3d at 1076. Courts, therefore, require "unequivocal" evidence and "objective facts" showing that the new habitual residence "supplanted" the previous habitual residence as the "primary locus" of a child's life. *Papakosmas*, 483 F.3d at 622; *Mozes*, 239 F.3d at 1079 (citing *Zenel v. Haddow*, 1993 S.L.T. 975, 979 (Scot. 1st Div.)); *but see Friedrich*, 78 F.3d at 1400 (requiring a preponderance of evidence).

## IV. Last Shared Intention

The court begins its analysis with the first prong: what was Mr. and Mrs. Green's last shared intention regarding their children's home? The court finds that the evidence demonstrates that Mr. and Mrs. Green intended to make Lake Louise the family's new home. The court's analysis begins with the law governing shared intent.

### A.

When determining the parents' last shared intent, the Ninth Circuit has divided cases into three broad categories. *Mozes*, 239 F.3d at 1076. The first category contains cases in which the family has

9

manifested a settled purpose to change its habitual residence, despite one parent's qualms about the move. *Id*. Courts presented with this scenario "are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." *Id*. at 1077.

The second category—which is inapplicable here—involves cases on the opposite side of the spectrum. This category includes a "translocation from an established habitual residence[, which] was clearly intended to be of a specific, delimited period." *Id*. Courts presented with this scenario generally refuse to find that the changed intentions of one parent causes an alteration in the child's habitual residence. *Id*.

The third category involves "[i]n between cases" in which "the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." *Id*. Courts presented with this scenario split. *Id*. Sometimes the circumstances show that the parents mutually intended their child to stay abroad indefinitely, despite the lack of a perfect consensus. *Id*. Other times the circumstances show that the parents had no shared intention, despite the fact that the parents agreed to leave the length of the stay undefined. *Id*.

The related concept "conditional" relocations also falls into this "in-between" category. In *Papakosmas*, the Ninth Circuit cited with approval opinions by the Second and Tenth Circuits regarding conditional moves. 483 F.3d at 625. In *Ruiz v. Tenorio*, the Eleventh Circuit found that a couple lacked mutual intent to change its habitual residence where one spouse moved to Mexico "in an attempt to save the marriage." 392 F.3d 1247, 1249 (11th Cir. 2004) (per curiam).

Similarly, in *Gitter v. Gitter*, the Second Circuit affirmed the District Court's finding that a couple's move to Israel was conditional, based on the trail judge's determination that Mrs. Gitter's testimony was more credible than her husband's testimony. 395 F.3d at 135. In *Mozes*, however, the Ninth

10

Circuit warned that motive must be distinguished from intent. 239 F.3d at 1074 ("Nor could we justify limiting habitual residence to persons who settle in an area for some particular motive.").

**B.**

Because there is no evidence indicating that the Green's dispute falls into the second category, the court must decide whether the first category or third category controls.

There is some evidence to suggest that the Green's move to Lake Louise falls in the first category (i.e., whether "the family has manifested a settled purpose to change its habitual residence, despite one parent's qualms about the move." *Id*. at 1076). First, Mr. and Mrs. Green deliberately visited Lake Louise to discern what life would be like if they decided to become habitually resident there. They met with Mr. Green's prospective supervisor, Dave Schebek, who testified that he wanted the couple to experience what "life in Lake Louise is all about." He introduced the couple to the community; he showed them a home that would be renovated for their family; and Mrs. Green appears to have participated in negotiating Mr. Green's compensation package with Mr. Schebek. The Greens weighed the pros and cons of living in a national park, which included free ski passes for the children and a forty minute bus ride to their schools; and they discussed the possibility of eventually buying a home outside of the park, although this appeared to have been cost prohibitive.

Second, when the couple returned to Las Vegas, they engaged in serious conversations that indicating an intention to abandon Las Vegas. Mrs. Green spoke with her ex-boyfriend, Rakan Hamawi, and her teenage children from her previous relationship with Mr. Hamawi. She gave the children the choice of remaining in Las Vegas or moving to Lake Louise with the Greens. One child decided to leave Las Vegas and the other chose to stay. This required Mrs. Green to obtain Mr. Hamaw's consent to remove his child from Las Vegas. Mr. and Mrs. Green met with Mr. Hamawi on his front patio and discussed the move. He initially protested, stating that Mr. Green was "taking [his] child away" from him. This strongly

suggest that the Greens conveyed to Mr. Hamawi that the Greens shared a mutual intent to change the family's habitual residence from Las Vegas.

There is also evidence indicating that the Green discussed selling Mrs. Green's home in Las Vegas. Although Mrs. Green testified that she never intended to sell her home, a realtor sent her or Mr. Green listings of comparable properties, *see* (Doc. #26 at Ex. 4), and Mr. Green produced text messages from Mrs. Green in which she stated (1) "[w]e still need to sell at 550 just to clear," (2) "[i]f we can get the house straight, prices for sale and rental value is [*sic*] up," and (3) "[e]ven if we put what we owe on the end we still need to come up with the money to remodel and we don't have must time. The new mall opens oct [*sic*] so people will want to be in before then and people with kids will want to be in before school starts." (Doc. #26 at Ex. 5).

Third, the Greens took significant steps to physically relocate the family abroad. Mr. Green and his employer processed the family's immigration paperwork. Because of a recent change in Canada's immigration policy, this task proved burdensome and required some commitment by both spouses. Meanwhile, the Greens began selling possessions in Las Vegas. Mr. Green and Dawn Brown (i.e., Mrs. Green's sister) testified that the family had approximately three garage sales. The Greens packed up the vast majority of their remaining belongings, leaving behind only the appliances and some pieces furniture. In fact, even though Mr. Green had purchased new beds for the children in Canada, Mrs. Green packed up the children's existing beds in Las Vegas, which were put in storage in Canada. Atlas Van Lines, Inc. insured the value the goods it moved for the Greens for $93,000.00.

However, there is also evidence suggesting that the Green's relocation to Lake Louise falls in the second category of cases (i.e., the category involving "[i]n between cases where the petitioning parent had earlier consented to let the child stay abroad for some period of ambiguous duration." *Mozes*, 239 F.3d at 1077). According to Mr. Hamawi, the Greens told him that the move was not permanent. Consistent

with this, Mr. Hamawi stated that he only consented to his child living abroad for two years. Mrs. Green similarly testified that the family's time in Lake Louise was expressly limited to two years.

Although Mr. Green testified that he and Mrs. Green mutually intended the relocation to be permanent, he also testified that his employer initially expected the Greens to live in Lake Louise for three-to-five years. Sarah Gray, who is in charge of the company's human resources department, also testified that the company only offers one-year employment contracts. This evidence does not demonstrate that the Green's intended their move to be temporary, but it is consistent with such an intention.

Mrs. Green contends that additional evidence supports a finding that her relocation to Lake Louise falls into the second category of cases. She argues that she lacked mutual intent because she agreed to move on a conditional basis for two years to give her marriage a second chance and "see how things go." The court is unpersuaded.

Two years is more than enough time to establish a new habitual residence. "Being habitually resident in a place . . . need not mean that's where you plan to leave your bones." *Mozes*, 239 F.3d at 1074. "When the child moves to a new country accompanied by both parents, who take steps to set up a regular household together, the period need not be long." *Id.* at 1078.

In *Feder v. Evans-Feder*, the Third Circuit determined that six months was enough. 63 F.3d 217, 219 (3d Cir. 1995). In *Harsacky v. Harsacky*, the Court of Appeals of Kentucky determined that four months was enough. 930 S.W.2d 410, 412 (Ky. Ct. App. 1996) (cited by *Mozes*, 239 F.3d at 1078 n. 30). And, in *Re F (a minor) (child abduction)*, the Court of Appeal of England and Wales determined that one month sufficed. [1992] 1 F.L.R. 548, 555 (Eng. C.A.) (cited by *Mozes*, 239 F.3d at 1078 n. 30).[3]

---

[3] Because the Convention seeks "the uniformity of application across countries," the court "must be able to reconcile their decisions with those reached by other courts in similar situations." *Mozes*, 238 F.3d at 1072.

Nor is the court persuaded that Mrs. Green's decision to move in order to give her marriage a second chance and "see how things go" demonstrates the absence of a shared intent. As stated in *Mozes*, courts cannot "justify limiting habitual residence to persons who settle in an area for some particular motive." 239 F.3d at 1074. Doing so would erroneously confuse motive with intent. Here, there is little doubt that the Greens intended to move to Canada and establish a habitual residence there.

The Green family (1) processed immigration paperwork, (2) sold belongings, (3) discussed selling or renting their Las Vegas residence, (4) obtained consent from Mr. Hamawi to live abroad for two years, and (5) moved the vast majority of their belongings to Canada—including an extra set of the children's beds, which were placed in storage. Mrs. Green also obtained a position as a sales clerk in Lake Louise for six months. (Doc. #26 at Ex. 12). These actions do not indicate an intention to be habitually resident in Las Vegas. *See Holder*, 392 F.3d at 1018 (quoting E.M. Clive, *The Concept of Habitual Residence*, 1997 JURID. REV. 142) ("A person who has sold house and furniture and set off for a new life in another country would not be using words normally if he or she claimed to be still habitually resident in the old country.")

The court is also unpersuaded by Mrs. Green's insistence that Mr. Green's work history evidences the absence of a shared intention to make Lake Louise the family's habitual residence. She argues that because Mr. Green worked for long periods in other states while the family remained in Las Vegas, the court should infer that the family moved to Lake Louise while intending to center its life in Las Vegas. This is argument unpersuasive. When Mr. Green worked in other states, the family remained in Las Vegas. That is not the case here. Mrs. Green left Las Vegas with her children and sought consent from Mr. Hamawi so that she could remove his child as well. This demonstrates a clear intention to abandon Las Vegas.

14

The court, therefore, finds that Mr. and Mrs. Green manifested a shared intention to abandon Las Vegas and make Lake Louise the children's habitual residence.

### V. Acclimation

Having concluded that the Green family intended to abandon the United States and become habitually resident in Canada, the court turns to the second prong and considers whether objective facts unequivocally point to the conclusion that the Greens' children acclimated to Lake Louise so that Las Vegas may be deemed supplanted. *Mozes*, 239 F.3d at 1079. Mr. Green did not satisfy this standard.

"Acclimation" is more than mere "acculturation." *Holder*, 392 F.3d at 1019. The court's inquiry is not whether the Green children prefer hockey over baseball or skiing in the Canadian Rockies over hiking in Red Rock Canyon. *Id.* As stated by the Second Circuit, the question is "whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would be tantamount to taking the child out of the family and social environment in which its life has developed." *Guzzo*, 719 F.3d at 108 (citing *Gitter*, 396 at 134). The Ninth Circuit's opinion in *Mozes* states that the evidence must be "unequivocal." 239 F.3d at 1079.

Mr. Green did not produce unequivocal evidence showing that his children's relative attachments to Lake Louise supplanted their relative attachments to Las Vegas. He demonstrated that the children enrolled at Banff Elementary School for one year, became proficient skiers, and had their own bedrooms, which still contain the children's toys, clothing, bedspreads, and other personal effects. *See* (Doc. #26 at Exs. 10, 11, 19); (Mins. Proceedings #22). However significant, these attachments approximate "[t]he academic year aboard." *Mozes*, 239 F.3d at 1083. They do not unequivocally outweigh the children's relative attachments to Las Vegas.

Both children were born and raised in Las Vegas. Before moving to Canada for one year, they had spent their entire lives in Las Vegas. Both pairs for grandparents live in Las Vegas. Except for the one

year in Canada, the children had completed the entirety of their education in Las Vegas. Additionally, even though Mrs. Green considered selling the home in which she raised her children, she did not. The children live there today.

Although parental intent generally determines the location of a child's habitual residence, it is not dispositive. A child may "lose its habitual attachment to a place even without a parent's consent." *See Papakosmas*, 483 F.3d at 622 (citing *Mozes*, 239 F.3d at 1081). Alternatively, a child may "become so firmly embedded in [a] new country as to make it habitually resident even though there be lingering parental intentions to the contrary." *Mozes*, 239 F.3d at 1078 (citation omitted).

The court is also persuaded that a shared parental intent to relocate a family should be given less weight in the context of an unstable marriage. *See Ruiz*, 392 F.3d at 1255 (considering martial stability as a factor). Even if the parents agree to relocate the family, the child's awareness that his parents have separated before, and may divorce in the future, may color the child's relative attachments to the respective locations.

Here, the Greens mutually intended to establish a new habitual residence in Lake Louise in order to save an unstable marriage. However, Mrs. Green left Mr. Green and returned to Las Vegas with the children before they had an opportunity to developed sufficient attachments to Lake Louise that would have supplanted their strong attachments to Las Vegas. The court, therefore, finds that Las Vegas is the children's habitual residence.[4]

---

[4] Because the court recommends denying Mr. Green's petition, it also recommends denying his request for fees and costs under the Convention's mandatory fee-shifting provision. *See* 22 U.S.C. § 9007(b)(3). Because the Convention does not provide for an award of fees and costs to prevailing Respondents, the court also recommends denying Mrs. Green's request for fees and costs. *See id.*; *see also Culculoglu v. Culculoglu*, No. 2:13-CV-00446-GMN, 2013 WL 4045905, at *17 (D. Nev. Aug. 8, 2013) (denying requests for fees and costs in an analogous matter).

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that Mr. Green's Motion for the Return of Children (#8) be DENIED.

IT IS FURTHER RECOMMENDED that and Mr. Green's Petition for Warrant (#9) be DENIED.

DATED this 6th day of November, 2015.


_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE

17